Filed 8/30/21  P. v. Tran CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060129 |
| v. | (Super. Ct. No. C1477821) |
| MICHAEL DINH TRAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Clara, Shelyna V. Brown, Judge.  Affirmed.

Rudolph J. Alejo, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

After the first jury deadlocked, a second jury convicted defendant Michael Dinh Tran of one count of penetration by force (Pen. Code, § 289, subd. (a)(1)(A); count 1)[1] and one count of sexual battery (§ 243.4, subd. (e)(1); count 2.)  The court sentenced defendant to three years in state prison on count 1 and a concurrent 30 days in county jail on count 2.

Defendant raises two issues on appeal.  First, he contends the court erred by striking his answer to a question asked by his counsel on direct examination.  Second, he argues the court erred by providing CALCRIM No. 370, which instructed the jury that the prosecutor did not have to prove motive.  For the reasons below, any error was harmless.  We accordingly affirm the judgment.

## FACTS

*Prosecution Case*

G.D., the victim, testified defendant sexually assaulted her on two occasions in October 2013.  She had moved from Vietnam to the United States when she was 17 years old.  At the time of the two incidents, she was 22 years old and recently married.  She and her husband rented a room in defendant's home, which was occupied by defendant, his family, and several tenants.

*A. The First Incident*

The first sexual assault incident occurred on October 19, 2013.  At around 8:00 or 9:00 p.m., G.D. finished eating dinner in the garage with her husband and defendant's wife.  While her husband stayed in the garage to wash dishes, she went upstairs to change her clothes because she and her husband were planning to go out.  G.D. testified she encountered defendant on the staircase and he touched her as she passed him.  Although she could not remember where he touched her at the time of the

_____

[1]  All further statutory references are to the Penal Code.

2

trial, she previously had stated he touched her on the waist. She then went upstairs and changed into a skirt and shirt.

When she came back downstairs, she encountered defendant who was holding a baby's bottle. According to her testimony, he asked if she had lost 10 pounds and touched her "everywhere." He moved behind her and held her against him with his left hand while he placed his right hand in her underwear. She believed he touched her genitals. After kissing her cheek and ear, she testified he bent down and asked in Vietnamese if he could "lick it." She was shocked, tried to push him away, and eventually went back to the garage where she found her husband and defendant's wife. She testified she did not tell her husband what had happened for personal and cultural reasons.

A few days later, defendant asked G.D. if she had told anyone about the incident and asked her not to tell anyone about what had happened. On October 23, 2013, G.D. and her husband argued about money and not being able to afford to move. During that conversation, she sent text messages to her husband telling him defendant had touched her.

### B. The Second Incident

The second sexual assault incident occurred on October 25, 2013. G.D. left her room in the morning and saw defendant in the hallway as she was walking to the bathroom. She testified defendant said, "I miss you." She was scared and locked the bathroom door while she showered. After showering, she brushed her teeth at the sink, which was open to the hallway. Defendant approached and touched her arms and waist. G.D. said, "[N]o, no, no," and defendant walked away. G.D. then decided to turn on the video recorder on her cell phone in case defendant returned. When he did come back, G.D. testified he pushed her into the bathroom area, pulled down her pants, touched the outside area of her genitals, and licked his finger. G.D. again said, "[N]o, no, no."

3

Defendant left and later returned a third time, kissed her, pushed her into the bathroom, pulled down her pants, and put his finger inside her genitals.

G.D. managed to record two videos of the incident, which were translated from Vietnamese to English in transcripts provided to the jury. According to the transcripts, the first video captured defendant saying, "Don't be afraid. Good job"; "There's nothing to be afraid of." G.D. said, "No, no," and "Take it out. No, no." At one point, defendant also said, "Put your legs away" and G.D. replied, "No." The second video captured defendant kissing G.D., and G.D. saying, "No. Get it out, get it out."[2]

Soon after, G.D. called her husband and told him what had happened. Her husband called the police, and she had a sexual assault (SART) exam on the evening of the incident. G.D. described the two incidents to the nurse who discovered some trauma on the outside of G.D.'s vaginal opening. The nurse testified the injuries were consistent with G.D.'s reports but could have been the result of other potential causes.

*Defense Case*

The defense presented different versions of both incidents. Defendant was 56 years old, married, and a father to four children at the time of the encounters. He testified he was active in the local Vietnamese community and ran for city council and mayor of San Jose. He owned a large home and rented some of the rooms to several people, including G.D. and her husband. At trial, defendant's counsel generally argued that G.D.'s allegations were a set-up for a lawsuit she filed against defendant seeking $2 million in damages.

*A. The First Incident*

According to defendant, he was feeding his baby on the night of the first incident. G.D. called him to come out of the baby's room and asked him if she looked

---

[2] At trial, G.D. testified the transcripts mistranslated her statement "Get out" as "Take it out," and defendant's statement "Spread your legs open" as "Put your legs away."

4

pretty. After he said yes, she mentioned she lost 10 pounds and told him to touch her stomach if he did not believe her. When he did, G.D. pushed his hand down into her underwear, and he briefly touched her until he became scared his wife would catch them. They both eventually went back to the garage where G.D. winked and smiled at him.

The next day, defendant asked G.D. if she had told anyone and patted her on the butt. She said she did not tell anyone. Defendant testified he told her it was between the two of them and asked her not to tell his wife.

### B. The Second Incident

On the day of the second incident, defendant testified he was vacuuming the hallway when G.D. called out to him from the bathroom area. She said she wanted to show him a naked picture of herself and ran to the sink to brush her teeth. Defendant noticed G.D. had her phone in her hand and began walking towards her. He testified he stood there waiting for her to show him the picture as she brushed her teeth. He eventually said he missed her, asked for a kiss, and put his arms around her waist. He also testified he put his hand in her pubic region for "a split of a second" and touched her pubic hair. G.D. closed her legs, and defendant asked her to open them. G.D. said, "No, no, no." Defendant then pulled his hand out, saw himself in G.D.'s phone, and realized she was recording him. He was afraid G.D. would post the video on the Internet and tried to grab the phone but was "not able to snatch it away from her."

After walking away, defendant "felt [he] was entrapped" because he was being recorded. He then returned and tried to get the video by grabbing the phone, but she moved it from side to side to prevent him from getting it. He testified the second video recording depicted him trying to grab the phone. He ultimately gave up because he did not want his wife to hear them. He also testified he thought he was in a "consensual relationship" or "extramarital affair" with G.D. He "didn't know that she was going to turn around and hurt [him] like this."

5

Several days later, defendant received a pretext call from G.D. that was recorded by the police. The prosecutor introduced certain portions of this call at trial, and defendant's testimony about the call is central to this appeal. During the call, G.D. told defendant she was scared at the time of the two incidents. Defendant told her not to be afraid, said he would make her happy, and told her not to tell anyone what had happened. When defendant's counsel asked if he had any "intention" during this pretext call, defendant testified he "wanted to see [G.D.] to have a business exchange . . . to be able to buy off the [video recordings] from her." He testified he did not mention this during the call because he believed "she would never want to see [him]" "[i]f he said it on the phone." Instead, he "wanted her to be happy so that she would meet up with [him]." He testified, "I was just trying to get her to meet up with me, so I can pay her so that I can get that tape."

Defendant also testified he did not tell the police the truth because he "thought that the relationship [he] had with [G.D.] was between the two of us and she would never report it to the police." He thought "the most she would do would put this video clip online and then try to extort money from [him]." He eventually told the police that he "just touched her pubic hair area." Although he claimed to have known about the video recording, he testified he "didn't know what was on it [so] there was no reason . . . to tell [the police]" about it.

## DISCUSSION

Defendant contends the court erred by striking his answer to a question asked on direct examination about the pretext call with G.D. He also argues the court erroneously instructed the jury that "[t]he People [were] not required to prove . . . the defendant had a motive to commit any of the crimes charged." (CALCRIM No. 370.) Even assuming the court erred by striking defendant's testimony or instructing the jury with CALCRIM No. 370, any error was harmless.

6

*Any error in excluding defendant's testimony was harmless.*

### A. Excluded Testimony

During defendant's direct examination, his attorney asked the following question about the pretext call: "Now, what did you agree to when you talked to [G.D.] on October 30, 2013." The prosecutor asserted a hearsay objection. After a side bar conference, which was not transcribed, defendant's counsel asked, "Mr. Tran, so after you realized that you were recorded that she has the video, did you make any attempt to try to get the videos from her, from [G.D.]?" Defendant responded, "I was hoping that she would call me after that. And so when she called me, I wanted to meet with her. And I would like to conduct a business transaction with her, give her money in exchange for the video." The prosecutor objected, "Objection. Misstates his statement." The court sustained the objection and struck defendant's answer.

Defendant's counsel then asked, "What is the misstatement? My client is testifying as to his intention." The court responded, "Well, the answer is stricken. Next question." Defendant's counsel then ended his direct examination: "Now, Your Honor, at this time, I don't have anything further for my client."

### B. Harmless Error

Defendant argues the court violated his Sixth Amendment right to present a defense and his Fourteenth Amendment right to a fair trial by striking his testimony. He notes "[t]he entire theory of defense was that [G.D.] set [defendant] up by recording the video" and his counsel "sought to elicit evidence on this point, and additionally explain why [he] did not wish to contradict [G.D.] during the pretext call." He claims the court prevented him from introducing this evidence, which was "a key point of his defense." In support of his claim, he cites *Crane v. Kentucky* (1986) 476 U.S. 683 for the proposition that criminal defendants are guaranteed "a meaningful opportunity to present a complete defense."

While we typically review a trial court's ruling on the admissibility of evidence for an abuse of discretion, we need not determine whether the exclusion of defendant's testimony constituted error because any error was harmless and did not infringe on defendant's constitutional right to present a defense. (*People v. Henriquez* (2017) 4 Cal.5th 1, 31.) "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . , and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

"It [also] is a well-established rule that the exclusion of evidence will not be considered prejudicial where other evidence to the same effect has been received." (*People v. Chapman* (1962) 207 Cal.App.2d 557, 574; see also *People v. Fudge, supra*, 7 Cal.4th at p. 1103 [no prejudicial error because "much of the [excluded] evidence was ultimately placed before the jury"]; *People v. Heishman* (1988) 45 Cal.3d 147, 194 [same].)

Here, the court ultimately admitted evidence supporting defendants' theory that G.D. "set him up in order to extort him." Defendant testified G.D. initiated and consented to the first incident and entrapped him into committing the second incident. Although the court initially struck defendant's testimony regarding the pretext call, the same testimony was allowed on redirect examination. His counsel asked, "So when you had this pretext phone call, what intention, if any, did you have at that time?" Defendant

8

testified, "I wanted to see her to have a business exchange with her to be able to buy off the tape from her." His counsel then asked, "Why didn't you tell her on the phone that you would be willing to do that?" Defendant responded, "If I said it on the phone, she would never want to see me." He further testified, "At that time I did not think about arguing with her. I was just trying to get her to meet up with me, so I can pay her so that I can get that tape." Based on this evidence, defendant's counsel argued defendant noticed G.D. was recording the second incident and his "purpose" during the pretext call was "as he testified, to get her to meet him somewhere so that he [could], if possible, negotiate with her, even the possibility of paying her money . . . to get the phone, basically, the recording video . . . ." Given this and in light of the evidence against defendant, no reasonable probability existed that defendant would have obtained a different result had the court admitted his statement during direct examination.

By sustaining the prosecutor's objection for "misstating his statement," defendant contends the court "told the jury that [his] testimony was inconsistent with his past statements (something the defense hotly disputed) and as such could not be considered." But the prosecutor's objection was ambiguous as to what prior statement was misstated. Defendant also does not clarify this on appeal, but we assume he refers to the prior statements he made during the pretext call or to the police. Regardless, we find no prejudicial error because the court ultimately allowed defendant to testify on the relevant subject matter as discussed *ante*.

Finally, to support his argument that the court's ruling was prejudicial, defendant notes the jury in the first trial deadlocked. He claims that jury heard defendant's testimony and "[t]he only material difference between the two trials was the trial court's ruling at issue here." We disagree and do not rely on defendants' speculation as to why the first trial resulted in a hung jury. For the foregoing reasons, any error in striking defendant's testimony on direct examination was harmless.

9

*Any error regarding CALCRIM No. 370 was harmless.*

Defendant next contends the court erred by instructing the jury with CALCRIM No. 370. As given to the jury, CALCRIM No. 370 stated: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty." According to defendant, this instruction improperly relieved the prosecution of its burden of proving defendant penetrated G.D. "'for the *purpose of* sexual abuse, arousal, or gratification" – an element of count 1 (penetration by force). He relies on section 289, subdivision (k)(1), which defines sexual penetration as "penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for *the purpose of sexual arousal, gratification, or abuse* by any foreign object, substance, instrument, or device, or by any unknown object." (Italics added.)

But defendant did not challenge the instruction or request any clarifying modification in the trial court proceedings. "The longstanding general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We nevertheless address the merits because defendant contends the instruction violated his constitutional rights.

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) In so doing, "'"""we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'"""" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 915.) We also presume the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

10

When conducting our inquiry, "'[a] single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.'" (*Covarrubias,* at p. 906.)

While we find the court erred and the error was harmless, we first address specific arguments raised by the parties. Defendant contends "[t]he sexual offense here is analogous to the financial gain special circumstance in one key respect. There is a specific intent element that requires the jury to determine 'the reason a person chooses to commit a crime.'" But the cases defendant cites do not address instructional error and instead concern the sufficiency of the evidence of financial gain. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1308-1309; *People v. Staten* (2000) 24 Cal.4th 434, 461.) Another case held the jury would not have been confused by a similar motive instruction because the instruction referred to the crime charged and not to any special circumstance allegation. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1027.) The cases accordingly bear little resemblance to the alleged instructional issue in this case.

The People argue defendant's argument is foreclosed by *People v. Hillhouse* (2002) 27 Cal.4th 469 (*Hillhouse*). In *Hillhouse*, the defendant was charged with murder, robbery, and kidnapping for robbery. (*Id.* at p. 480.) The defendant argued the trial court erred by instructing the jury with CALJIC No. 2.51, which is similar to CALCRIM No. 370: "'[m]otive is not an element of the crime charged and need not be shown.'" (*Id.* at p. 503.) He claimed the motive instruction "contradicted the other instructions, because motive *is* an element of the various crimes." (*Ibid.*) Our Supreme Court disagreed and held "motive" was not an element of the crimes "[a]lthough malice and certain intents and purposes [were] elements of the crimes." (*Id.* at pp. 503-504.) The court explained: "'Motive, intent, and malice . . . are separate and disparate mental states. The words are not synonyms.'" (*Ibid*.) "Motive describes the reason a person

chooses to commit a crime.  The reason, however, is different from a required mental state such as intent or malice."  (*Id.* at p. 504.)

Although *Hillhouse* noted "malice and certain intents and *purposes* [were] elements of the crimes," the case did not explicitly state whether "motive" was a distinct mental state from "purpose."  (*Hillhouse, supra*, at pp. 503-504, italics added.)  The case also did not address a violation of section 289, which is at issue here.  We accordingly are not persuaded by the People's assertion that *Hillhouse* forecloses defendant's argument.

Here, as in *People v. Maurer* (1995) 32 Cal.App.4th 1121, the charged sexual crime required a finding of sexual interest.  In *Maurer*, the appellate court reversed two convictions for misdemeanor child annoyance because the trial court instructed the jury the defendant's conduct had to be motivated by an unnatural or abnormal sexual interest in the victim, but in another instruction, told the jury that "'[m]otive is not an element of the crime charged and need not be shown.'"  (*Id.* at p. 1125.)  The court explained the instructions were conflicting on the mental state element because the former properly said motive was required while the latter said motive was not required.  (*Ibid.*)  While the crime in *Maurer* required the defendant's conduct to be "motivated" by a certain sexual interest, we see no difference between a "motivated" sexual interest and a sexual "purpose."  (§ 289, subd. (k)(1) [requiring the penetration to be "for the purpose of sexual arousal, gratification, or abuse"].)  The court accordingly erred by providing CALCRIM No. 370.

Despite the erroneous instruction, the error was harmless beyond a reasonable doubt.  While CALCRIM No. 370 instructed that the People did not have to prove motive, it still allowed the jury to consider whether defendant had a motive, which would "be a factor tending to show that the defendant is guilty."  The court also instructed the jury with CALCRIM No. 1045, which defined sexual penetration as

12

"penetration . . . for the purpose of sexual abuse, arousal, or gratification."[3] We presume the jurors were capable of correlating the instructions and prioritizing the specific instructions over the general ones.  In any event, in closing argument, the prosecutor argued defendant "digitally penetrate[d] [G.D.] . . . for the purpose of sexual gratification."  The prosecutor said it was clear it was "for the purpose of sexual gratification" because defendant "[said] on the pretext call he just wanted to please her, [said] it multiple times."  The prosecutor also suggested defendant was a "sexual predator" and argued he "target[ed] a woman who he thought was weaker than him."  Considering the entire instructions given to the jury and the People's argument regarding defendant's "sexual gratification" purpose, any error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

---

[3] Although the difference is immaterial, we note CALCRIM No. 1045 included slightly different language than section 289.  (Compare CALCRIM No. 1045 ["for the purpose of sexual abuse, arousal, or gratification"] with § 289, subd. (k)(1) ["for the purpose of sexual arousal, gratification, or abuse"].)

13